UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

CREAZIONI ARTISTICHE MUSICALI,
S.r.l.,

                              Plaintiff,

        -v-

CARLIN AMERICA, INC., *et al.*,

                              Defendants.

No. 14-cv-9270 (RJS)
OPINION AND ORDER

---

RICHARD J. SULLIVAN, District Judge:

    Plaintiff Creazioni Artistiche Musicali, S.r.l. brings suit against Defendants Carlin America, Inc., Edward B. Marks Music Co., and John Does 1–10 alleging copyright infringement in connection with recordings of a song popularized by the Muppets (and others) half a century ago.  Now before the Court is Defendants' motion to dismiss the First Amended Complaint for failure to state a claim upon which relief can be granted.  For the reasons set forth below, Defendants' motion is GRANTED.

I.  BACKGROUND

A.  Facts

    On October 4, 1966, in Rome, Italy, Plaintiff, an Italian music publishing company, entered into a written agreement with the Italian composer Piero Umiliani to compose and

perform music for the Italian-language action film *Duello nel Mondo* (the "1966 Film").[1]  (FAC ¶¶ 1, 14; *see also* 1966 Agmt. ¶ 1.)  In the 1966 Agreement, Umiliani transferred "[a]ll rights to use the music that [he] composed, from the time of its creation . . . to [Plaintiff] for the entire world with the right to transfer it in whole or in part to third parties, so long as [Umiliani's] rights are not prejudiced or limited."  (1966 Agmt. ¶ 2.)  Umiliani "also [gave Plaintiff] the right to extract one or more musical excerpts from the soundtrack for any adaptations or arrangements that [Plaintiff] deem[s] necessary for the best commercial use and to add any lyrics to the individual musical tracks with the full freedom to choose the author and the works so long as [Umiliani's] moral rights are not prejudiced."  (*Id.*)  The 1966 Agreement also gave Plaintiff the rights "to distribute and reproduce the music in any form and using any method."  (*Id.* ¶ 5.)

Umiliani composed "M33" ("Instrumental") and "M33 with vocals" ("Vocal") for the 1966 film's soundtrack.  (FAC ¶¶ 2, 14–15, 27–28.)  Though "substantially similar" to Instrumental, Vocal adds a soloist "singing a lyric of nonsense syllables over the existing melody, harmony, rhythm, and structure" of Instrumental.  (*Id.* ¶¶ 29–30.)  The 1966 Agreement was registered with SIAE, the Italian music-rights society, on December 31, 1966.  (*Id.* ¶¶ 16, 31.)  Plaintiff alleges that it owns the copyright in Instrumental and Vocal by virtue of the 1966 Agreement, including the exclusive rights to commercially exploit derivative works of the two songs.  (*Id.* ¶¶ 2–3, 14, 27.)  In June 1968, Umiliani composed the song known as *Mah Na Mah Na*.  (*Id.* ¶ 37.)  Though originally written for the film "Svezia, Inferno e Paradiso" ("Sweden,

---

[1] The following facts are taken from the First Amended Complaint (Doc. No. 3 ("FAC")) and from the parties' agreed-upon translation of the October 4, 1966 agreement (Doc. No. 14-1 ("1966 Agmt." or the "1966 Agreement")); *see also Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002) (Court may consider extrinsic document on motion to dismiss where the complaint relies heavily upon its terms and effect.).  The Court has also considered the parties' pre-motion letters (Doc. Nos. 5, 6), Defendants' memorandum of law in support of dismissal (Doc. No. 19 ("Mem.")), Plaintiff's opposition (Doc. No. 28 ("Opp'n")), Defendants' reply (Doc. No. 31), Plaintiff's supplemental opposition (Doc. No. 40 ("Supp. Opp'n")), and Defendants' supplemental reply (Doc. No. 43).  As set forth in footnote three, the Court has also considered the parties' submissions regarding Italian law.

Heaven and Hell"), Umiliani's *Mah Na Mah Na* became "extremely successful" after being performed by the Muppets on television and in film soundtracks.  (*Id.* ¶¶ 37, 45.)  Plaintiff alleges that *Mah Na Mah Na* is "identical, virtually note-for-note," to Vocal in its "melody, harmony, rhythm, structure, and lyrics" and "substantially similar" to Instrumental for similar reasons, and, accordingly, is an "unauthorized derivative work."  (*Id.* ¶¶ 40, 42, 45; *see also id.* ¶¶ 3, 48, 50, 53; Opp'n 8–13.)

### B.  Procedural History

Nearly fifty years after the publication of *Mah Na Mah Na*, Plaintiff brought suit in this Court on November 21, 2014 (Doc. No. 1), alleging that Defendants infringed Plaintiff's copyrights in Instrumental and Vocal by preparing, reproducing, publicly distributing, and publicly performing *Mah Na Mah Na* and/or authorizing others to engage in such acts (FAC ¶¶ 50, 53).  On March 11, 2015, Plaintiff amended its complaint to elaborate on its allegations (Doc. No. 3), and on June 15, 2015, the Court received the parties' agreed-upon translation of the contract (Doc. No. 14).  On June 24, 2015, Defendants filed the instant motion to dismiss Plaintiff's Amended Complaint.  (Doc. No. 18.)  Plaintiff submitted its opposition on July 24, 2015, while Defendants submitted their reply on August 3, 2015.  (Doc. Nos. 28, 31.)

On February 23, 2016, the Court held a conference to address choice-of-law issues in this case and ordered supplemental briefing, including expert reports and declarations, on Italian law. (Doc. Nos. 35, 38.)  On May 17, 2016, Plaintiff filed a supplemental opposition brief (Doc. No. 40), and on June 21, 2016, Defendants submitted a supplemental reply brief (Doc. No. 43).  On July 12, 2016 and September 13, 2016, the Court held hearings and took testimony from the parties' experts regarding Italian law.

II.  LEGAL STANDARD

A.  Rule 12(b)(6)

To survive a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, a complaint must "provide the grounds upon which [the] claim rests." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007); *see also* Fed. R. Civ. P. 8(a)(2) ("A pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief . . . ."). To meet this standard, plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In reviewing a Rule 12(b)(6) motion to dismiss, a court must accept as true all factual allegations in the complaint and draw all reasonable inferences in favor of the plaintiff. *ATSI Commc'ns*, 493 F.3d at 98. However, that tenet "is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. Thus, a pleading that offers only "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. If the plaintiff "ha[s] not nudged [its] claims across the line from conceivable to plausible, [its] complaint must be dismissed." *Id.* at 570.

B.  Standing Under the Copyright Act

As relevant here, the Second Circuit has instructed that a plaintiff suing for copyright infringement in a United States court must satisfy the statutory standing test set forth under the United States Copyright Act even where, as noted below, the law of a foreign jurisdiction governs other issues in the case. *Itar-Tass Russ. News Agency v. Russ. Kurier, Inc.*, 153 F.3d 82,

4

91 (2d Cir. 1998).   Thus, in order to have standing to sue, a plaintiff must be "the legal or beneficial owner of an exclusive right under a valid copyright at the time of the alleged infringement." *Hutson v. Notorious B.I.G., LLC*, No. 14-cv-2307 (RJS), 2015 WL 9450623, at *3 (S.D.N.Y. Dec. 22, 2015) (citing 17 U.S.C. § 501(b) and *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991)); *accord Davis v. Blige*, 505 F.3d 90, 101 (2d Cir. 2007). Where a plaintiff is not the initial author, it may bring suit only if it has acquired ownership of the copyright or an "exclusive license" from the original copyright holder. *Davis*, 505 F.3d at 101.   By contrast, "the holder of a nonexclusive license may not sue others for infringement." *Id.*

## III.  DISCUSSION

### A.  Choice of Law

Before turning to the merits, the Court must first address choice of law.   As noted above, the parties' dispute centers on the scope of Umiliani's alleged transfer of his rights in Vocal and Instrumental under the 1966 Agreement.   This issue is potentially dispositive, since absent a transfer of ownership or an exclusive license under the 1966 Agreement, Plaintiff would lack standing to sue.   Defendants argue that Italian law governs this dispute, while Plaintiff urges the Court to apply United States law.   (*Compare* Mem. 6, *with* Opp'n 3.)   Because there is no applicable choice-of-law provision under the United States Copyright Act to resolve this conflict, the Court "fill[s] the interstices of the Act" by applying "federal common law on the conflicts issue." *Itar-Tass*, 153 F.3d at 90.   "The federal common law choice-of-law rule is to apply the law of the jurisdiction having the greatest interest in the litigation." *In re Koreag, Controle et Revision S.A.*, 961 F.2d 341, 350–51 (2d Cir. 1992).   Accordingly, the Court must "evaluate the various contacts each jurisdiction has with the controversy, and determine which

5

jurisdiction's laws and policies are implicated to the greatest extent." *Id.* at 350. Furthermore, district courts "may consult the Restatement (Second) of Conflict of Laws" for guidance in weighing the interests of different jurisdictions. *Eli Lilly Do Brasil, Ltda. v. Fed. Express Corp.*, 502 F.3d 78, 81 (2d Cir. 2007) (internal quotation marks and brackets omitted).

Applying these principles in the context of copyright disputes, the Second Circuit has concluded that "[c]opyright is a form of property, and the usual rule is that the interests of the parties in property are determined by the law of the state with 'the most significant relationship' to the property and the parties." *Itar-Tass*, 153 F.3d at 90. As a general matter, the law of the jurisdiction where an artistic work is "created" and "first published" governs issues concerning copyright *ownership*. *See id.* ("Since the works at issue were created by Russian nationals and first published in Russia, Russian law is the appropriate source of law to determine issues of ownership of rights."); *accord Saregama India Ltd. v. Mosley*, 635 F.3d 1284, 1290 (11th Cir. 2011) (since song "was created in India, our interpretation of the Agreement and ultimate determination of whether [plaintiff] owns a copyright in the [song's] sound recording is governed by Indian copyright law"). By contrast, the Second Circuit has analogized copyright *infringement* issues to tort claims. *Itar-Tass*, 153 F.3d at 91. Consistent with the principle of *lex loci delicti* often applied in tort suits, the law of the jurisdiction where the allegedly infringing acts take place generally governs infringement issues. *Id.* (applying United States law to issues related to copyright infringement, since the alleged copyright infringement took place in the United States).

Although issues of assignment would appear to be more analogous to ownership than infringement, the jurisprudence concerning voluntary assignment of copyright – the relevant issue in this motion – is admittedly less well developed. *See id.* at 91 n.11 (declining to address

choice-of-law issues concerning copyright assignment); *see also Close-Up Int'l, Inc. v. Berov*, 382 F. App'x 113, 116 n.2 (2d Cir. 2010) (similarly declining to reach the issue).  The Court takes guidance from the Restatement, which instructs courts to determine which jurisdiction has the most significant relationship to the dispute based on factors such as:  (1) "the needs of the interstate and international systems," (2) "the relevant policies of the forum," (3) "the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue," (4) "the protection of justified expectations," (5) "the basic policies underlying the particular field of law," (6) "certainty, predictability and uniformity of result," and (7) "ease in the determination and application of the law to be applied."  *Restatement (Second) Conflicts of Laws* § 6 (Am. Law Inst. 1971); *see also Eli Lilly*, 502 F.3d at 81; 5 *Nimmer on Copyright* §§ 17.05, 17.11[B][2] & n.25.  In weighing these factors, the Restatement further instructs that in contractual disputes, the following five contacts are "to be taken into account":  (1) "the place of contracting," (2) "the place of negotiation of the contract," (3) "the place of performance," (4) "the location of the subject matter of the contract," as well as (5) "the domicile, residence, nationality, place of incorporation and place of business of the parties." *Restatement (Second) Conflicts of Laws* § 188[2].  By way of example, "[i]f two parties gather in St. Petersburg, sign a contract in Russian for exploitation of a work by Aleksandr Solzhenitsyn, in Russia and throughout the world, with a Russian choice-of-law provision, then one may hazard to venture that Russian law exerts 'the most significant relationship' to the parties' interests." *Nimmer* § 17.05[B][2][b].

The Restatement provides other useful guidance.  For example, "[w]hen the acts of assignment on the part of both assignor and assignee are done in the same state, this state will usually be the state of most significant relationship, except when the place of assignment bears

no normal relation to the transaction." *Restatement (Second) Conflict of Laws* § 209 cmt. c. Furthermore, "protection of the justified expectations of the parties is of considerable importance" with respect to conflicts involving property, since the parties "expect certain legal consequences to ensue from a given transaction and, in the absence of strong countervailing considerations, their expectations should not be disappointed." *Id.* § 222 cmt. b. In the same vein, the Supreme Court has also instructed that a "paramount goal" of copyright law is to "enhance[e] predictability and certainty of copyright ownership." *Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730, 749 (1989).

Here, Italy is the jurisdiction where the 1966 Agreement was executed, where Vocal and Instrumental were created, where *Il Duello del Mondo* was produced, and where all parties to the 1966 Agreement were domiciled. Tellingly, Umiliani and Plaintiff consented to the "sole jurisdiction" of the Court of Rome over "any dispute" arising between Umiliani and Plaintiff under the 1966 Agreement, which also supports a finding that the parties expected Italian law to govern issues relating to ownership and assignment. (1966 Agmt. ¶ 8). Furthermore, the 1966 Agreement expressly contemplates Umiliani's retention of "moral rights" (*id.* ¶ 2), which were recognized under Italian law at the time, but were not available in the United States. *Compare Gilliam v. Am. Broad. Cos., Inc.*, 538 F.2d 14, 24 (2d Cir. 1976) ("American copyright law . . . [does] not recognize moral rights or provide a cause of action for their violation."), *with* Alberto Musso & Mario Fabiani, "Italy" § 7[1] in *International Copyright Law and Practice* (Lionel Bently ed., 2015) (outlining the Italian Copyright Act's "express provisions on moral rights").[2] The fact that United States law would therefore render at least certain portions of the 1966

---

[2] As discussed in greater detail below, moral rights guarantee "paternity or authorship of [the author's] work" and the right by the author "to object to any distortion or modification that may affect his [honor] or reputation." 5 Giorgio Mondini *et al.*, *World Intellectual Property Rights and Remedies* § 80:6 (Nov. 2016).

Agreement meaningless weighs heavily in favor of application of Italian law.  *See Eli Lilly*, 502 F.3d at 82 ("'The parties cannot be presumed to have contemplated a law which would defeat their engagements.'" (quoting *Pritchard v. Norton*, 106 U.S. 124, 137 (1882))).

Significantly, Plaintiff fails to point to any relevant contacts between the United States and the 1966 Agreement.  Rather, Plaintiff attempts to analogize this case to *Corcovado Music Corp. v. Hollis Music, Inc.*, 981 F.2d 679 (2d Cir. 1993), in which the Second Circuit applied United States law to a copyright dispute, notwithstanding the relevance of a series of Brazilian contracts.  (Doc. No. 6 at 2.)  That case, however, is, distinguishable from this one in several respects.  First, "the place of performance of the contracts" in *Corcovado* was the United States, *Corcovado*, 981 F.2d at 685, whereas the 1966 Agreement contemplated performance in Italy (*see* FAC ¶ 15).  Second, the *Corcovado* plaintiff "assert[ed] no rights whatsoever arising out of" the Brazilian contracts, and "they form[ed] no part of plaintiff Corcovado's case." *Corcovado*, 981 F.2d at 682.  Here, by contrast, Plaintiff's copyright claim is premised entirely on language set forth in the 1966 Agreement, an Italian contract.  Finally, the dispute in *Corcovado* centered on whether the author maintained his renewal term.[3]  Since "the reversion of renewal is a unique feature of U.S. law," and since "Brazilian law would presumably not recognize the assignment" at issue in the case, the public policy interests of the United States in application of United States law were deemed to be substantial in that dispute.  *See* 5 *Nimmer on Copyright* § 17.05[B][2][c] (distinguishing *Corcovado* from *Itar-Tass*).  Here, Plaintiff fails to point to any countervailing

---

[3] As the Second Circuit has explained, "the Copyright Act establishes two terms of protection:  an initial term of twenty-eight years from the date the copyright was originally secured and a renewal term of sixty-seven years," which is "a new estate clear of all rights, interests or licenses granted under the original copyright." *Gary Friedrich Enters., LLC v. Marvel Chars., Inc.*, 716 F.3d 302, 312 (2d Cir. 2013) (internal quotation marks and alterations omitted).  The purpose of the renewal term "is to provide authors a second opportunity to obtain remuneration for their works and to renegotiate the terms of the grant once the value of the work has been tested," *id.* (internal quotation marks omitted), and as the Second Circuit underscored in *Corcovado*, "there is a strong presumption against the conveyance of renewal rights" under U.S. law, *Corcovado*, 981 F.2d at 684.

policies that would be advanced by application of United States law to the 1966 Agreement, nor can the Court identify any.[4]

Accordingly, the Court concludes that application of Italian law comports with the justifiable expectations of the parties to the 1966 Agreement and that Italy has a greater interest in this controversy – as it pertains to the assignment of rights under the 1966 Agreement – than does the United States.  The Court thus applies Italian law to the parties' dispute concerning the 1966 Agreement.

### B.  Application of Italian Law to the 1966 Agreement

Having determined that Italian law applies, the Court next makes findings regarding the content of that law pursuant to Rule 44.1 of the Federal Rules of Civil Procedure, and then applies the law to the facts of this case.  *See* Fed. R. Civ. P. 44.1; *Itar-Tass*, 153 F.3d at 92 (noting that "[d]etermination of a foreign country's law is an issue of law" for determination by the district judge under Rule 44.1); *accord Rationis Enters. Inc. of Panama v. Hyundai Mipo Dockyard Co.*, 426 F.3d 580, 586 (2d Cir. 2005) (noting that "the responsibility for correctly identifying and applying foreign law rests with the court").  In making findings regarding Italian law, the Court has considered the declarations of Defendants' expert, Professor Paolo Marzano, and Plaintiff's expert, Professor Gustavo Ghidini; has held two hearings at which both of these experts testified; and has also conducted its own independent research.  (*See* Doc. Nos. 21, 41,

---

[4] It could be argued that the Berne Convention for Protection of Literary and Artistic Works, which provides that "[o]wnership of copyright in a cinematographic work shall be a matter for legislation in the country where protection is claimed," Berne Convention, Art. 14*bis* (2)(a), supports application of United States law here to the issues of ownership and assignment, since the 1966 Agreement involved a film score.  Even so, Plaintiff never made this argument and therefore has waived it.  And in any event, this provision "is not a part of domestic law" because "no provision of the Berne Convention is self-executing," and therefore, "courts are free to apply to ownership issues involving foreign cinematographic works the law of the country of origin."  7 *Patry on Copyright* § 25:55 (2016); *see also id.* § 25:54 (criticizing the Berne provision and finding that "[a] better approach would be to require application of the law of the country of origin").

42, 44); *see also Rationis Enters. Inc. of Panama*, 426 F.3d at 586 (noting that the district court has latitude under Rule 44.1 "to enlist the parties in this effort" in the "the proper determination of foreign law"); *Winn v. Schafer*, 499 F. Supp. 2d 390, 396 & n.28 (S.D.N.Y. 2007) (considering expert submissions and live testimony to determine the substance of foreign law at Rule 12(b)(6) stage); *Faggionato v. Lerner*, 500 F. Supp. 2d 237, 251 (S.D.N.Y. 2007) (same).

While the Court has also considered the declaration of Plaintiff's other expert, Mario Cantini, the Court did not find his testimony necessary or useful.  Mr. Cantini is a former a jazz piano player who also worked in the recording industry and claims to be an "expert" regarding the practices of the music publishing industry during the 1960s.  (Doc. No. 42.)  Under Italian law, "ambiguous" provisions in commercial contracts are interpreted by reference to industry customs.  *See* Patrick Tinsley & Prof. Avv. Alessio Di Amato, 3 *Digest of Commercial Laws of the World* § 30:31 (Aug. 2016) (citing Ital. Civil Code. art. 1368).  But because, for the reasons set forth below, the Court finds that the 1966 Agreement is not ambiguous, Mr. Cantini's declaration is not useful to the Court.  Mr. Cantini's declaration is also not helpful because it is highly conclusory.  For instance, Mr. Cantini asserts that the 1966 Agreement represents "the typical standard agreement and uses the typical standard language" in the Italian music industry, but he fails to point to any examples of other agreements as evidence.  In fact, his declaration is devoid of any citations.  *See Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 311 (2d Cir. 2008) ("An expert's conclusory opinions are . . . inappropriate.").  Accordingly, the Court places minimal weight on Mr. Cantini's conclusions.

Plaintiff asserts that, by virtue of the 1966 Agreement, it acquired an exclusive ownership interest in the "preparation, reproduction, public distribution, and public performance of [the two songs'] derivative works," including *Mah Na Mah Na*.  (FAC ¶¶ 50, 53.)  By contrast,

Defendants urge dismissal, arguing that, under the 1966 Agreement, "Umiliani did not transfer to [Plaintiff] an exclusive right to create and exploit derivative works," and therefore, Plaintiff lacks standing because it is not a legal or beneficial owner of this right.  In other words, according to Defendants, the composer "retained the right to create and to authorize [Defendants] to help create and exploit *Mah Na Mah Na*, even if *Mah Na Mah Na* is, as [Plaintiff] alleges, a derivative of" Instrumental or Vocal.  (Mem. 16.)  For the reasons set forth below, the Court agrees with Defendants.

Under Chapter III, Section I of the Italian Copyright Act (1941), a copyright owner holds a series of rights with respect to an intellectual work, including the rights to reproduce, distribute, publicly perform, modify, elaborate on, and transform the work.  Law No. 633 of April 22, 1941, for the Protection of Copyright and Neighboring Rights (as amended by Leg. Decree No. 685, Nov. 16, 1994) (It.), *available at* http://www.wipo.int/wipolex/en/text.jsp?file_id=128161; (*see also* Doc. No. 21-2) (the "Italian Copyright Act" or "1941 Act").[5]  The author, defined as the person who creates "a work resulting from an intellectual effort," is the first owner of the copyright and has the "exclusive right to the economic utilization of the work in any form or manner, whether original or derivative, within the limits fixed by [the] Law."  *Id.* arts. 6, 12.  In addition to his economic rights, an author has a series of inalienable moral rights, which, as noted above, guarantee "paternity or authorship of [the author's] work" and the right of the author "to object to any distortion or modification that may affect his [honor] or reputation."  Mondini § 80:6.

The Italian Copyright Act also includes certain special rules that apply to cinematographic works. For example, "the director, the author of any material adapted to the screen, the screenwriter, and the soundtrack composer" are considered "co-authors" of the work. *See* Musso & Fabiani § 4[1][a][ii]. Pursuant to Article 49 of the Copyright Act, the composers of musical components of cinematographic works "may reproduce [their parts of the work] or utilize them separately *in any manner*, provided no damage is thereby occasioned to the rights of utilization[,] the exercise of which belongs to the producer." 1941 Act art. 49 (emphasis added); *see also* Musso & Fabiani § 4[1][a][ii]. Therefore, as the composer of the film soundtrack, Umiliani maintained the right to reproduce the film score and utilize his creation *in any manner*, so long as the rights of the 1966 Film's producer (who is not named in the First Amended Complaint) were not prejudiced.

Of course, an author may transfer his economic rights, as is expressly recognized by Article 107 of the Italian Copyright Act. 1941 Act art. 107. Moreover, in construing "contracts effectuating copyright transfers," courts are to apply the principles of Italian contract law, "which are set forth in the [Italian] Civil Code." Musso & Fabiani § 4[3][a][i]. Under Section 1363 of the Italian Civil Code, "[e]very clause of the contract is interpreted with reference to all the others, attributing to each the meaning resulting from the act as a whole." *Pignoloni v. Gallagher*, No. 12-cv-3305 (KAM) (MDG), 2012 WL 5904440, at *24 (E.D.N.Y. Nov. 25, 2012) (quoting *Italian Civil Code*, Susanna Beltramo trans., Thompson Reuters (2012)). Furthermore, under Section 1367 of the Italian Civil Code, "[i]n case of doubt, the contract or

---

[5] Since both parties reference the same World Intellectual Property Organization translation of the Italian Copyright Act, the Court relies upon this translation as well. (Docs. No. 21-1, 41 at 7 n.1.) Although the Italian Copyright Act has been amended numerous times since 1941, both parties' experts agree that the relevant provisions at issue in this case have not substantially changed in a manner that would impact the outcome. (Doc. Nos. 41 at 7 n.1, 51 at 11:5–14.)

the individual clauses shall be interpreted in the sense in which they can have some effect, rather than in that according to which they would have none." *Id.*

While economic rights are freely alienable, the Italian Copyright Act employs several rules of construction that staunchly protect the rights of the original author.  As an authoritative treatise makes clear, the "narrow construction of copyright transfers . . . applies, as a matter of principle, to any contractual transfer of interests from the author to another party."  *See* Musso & Fabiani §§ 4[3][a][ii], 4[3][b][i].  Under Article 19, "[t]he exercise of any one right" on the part of an author "shall not exclude the exercise of the other rights."  1941 Act art. 19.  Consequently, "the contractual grant of one such right does not necessarily include the grant of the exclusive exercise of each of the other rights, so that any total assignment of all the economic components of copyright must be expressly agreed to."  Musso & Fabiani § 4[2][a].  In other words, Article 19 establishes a "general rule" that "the transfer of a right does not involve the transfer of all the other rights that are not strictly necessary to exercise the right assigned." Mondini § 80:13.

Article 119 provides further support for the narrow construction of copyright transfers. Under paragraph four of that provision, absent "express stipulation," a transfer of exploitation rights in an intellectual work "shall not extend to the rights of utilization in later elaborations and transformations to which the work may lend itself."  1941 Act art. 119.  As scholars have explained, this section of Article 119 is designed "to protect the interests of the authors who would not be capable of assessing the potential economic value of future rights."  Mondini § 80:13.  Furthermore, paragraph five of Article 119 creates a default presumption that "the alienation of one or more of the rights of utilization shall not imply the transfer of other rights which are not necessarily dependent upon the right transferred."  1941 Act art. 119.  And

14

although Article 119 is contained in the section of the Italian Copyright Act that addresses publishing agreements, it has been construed to "set[] out a general rule" applicable "in all cases of contracts conveying rights of use" that "any total assignment of all the economic components of copyright must be expressly agreed to."  Musso & Fabiani § 4[2][a].

The principle of narrow construction is especially salient in the context of commissioned works.  The Italian Supreme Court (also known as the "Supreme Court of Cassation") has instructed that "the rights to use a commissioned work belong to the commissioning party only within 'the limits of the object and purpose of the contract' under which the commission takes place."  *Id.* § 4[1][b][v].  Because "[o]nly those rights allowing the aim of the underlying contract to be reached will be considered as transferred," the commissioning party bears "the burden of proof of any wider transfer."  *Id.*

Having carefully considered the language of the contract and the relevant Italian law, the Court finds that the 1966 Agreement lacks the clear expression of intent necessary to transfer full ownership of the film score, let alone the exclusive right to exploit derivative works of Vocal and Instrumental.  According to the second paragraph of the 1966 Agreement:

> (2) All rights to use the music that you composed, from the time of its creation, shall be transferred to us for the entire world with the right to transfer it in whole or in part to third parties, *so long as your rights are not prejudiced or limited.* You also give us the right to extract one or more musical excerpts from the soundtrack for any adaptations or arrangements that we deem necessary for the best commercial use and to add any lyrics to the individual musical tracks with the full freedom to choose the author and the works so long as your moral rights are not prejudiced.  (1966 Agmt. ¶ 2 (emphasis added).)

Plaintiff relies heavily on the first sentence of this paragraph – which begins with Umiliani's conveyance of "[a]ll rights to use the music that [Umiliani] composed" to Plaintiff "for the entire world" – for the proposition that Umiliani transferred exclusive economic rights to Plaintiff. (*Id.*; *see also* Supp. Opp'n 4–13; Doc. No. 41 ("Ghidini Decl.") at 16.)  However, the Agreement

contains no express limitation on *Umiliani's own* rights to adapt and exploit the music he composed for the film, and without such an express stipulation, Umiliani's conveyance could not have included "rights of utilization in later elaborations and transformations." 1941 Act art. 119. To the contrary, the 1966 Agreement contains the express reservation that Umiliani's rights may "not [be] prejudiced or limited." (1966 Agmt. ¶ 2.) While Plaintiff argues that this provision reserved "contractual rights" under the 1966 Agreement to receive payment and "not rights under the Italian Copyright Act" (Supp. Opp'n 11), the Court finds Plaintiff's argument unpersuasive, since paragraphs four and five of the 1966 Agreement already set forth Umiliani's rights to consideration under the contract (1966 Agmt. ¶¶ 4, 5). Furthermore, the provision does not limit itself to contractual rights, but instead refers to "rights" generally. Indeed, the Court concludes that Plaintiff's reading of the contract, whereby Umiliani transferred his ownership of the copyright to Plaintiff, would render the "so long as your rights are not prejudiced or limited" condition surplusage. Because the Court must attribute meaning to each clause of the 1966 Agreement, *see Pignoloni*, 2012 WL 5904440, at *24, the Court finds Plaintiff's proffered interpretation that it obtained exclusive ownership of Vocal and Instrumental to be implausible.

The second sentence of paragraph two further buttresses this conclusion. If the "all rights" language truly conveyed "full and absolute ownership" of Instrumental and Vocal, as Plaintiff argues (Sept. 13 Tr. 14:14), then Umiliani's conveyance of the "right to extract one or more musical excerpts from the soundtrack" would be entirely unnecessary, since Plaintiff would already have the right to exclude all others, including Umiliani, from exploiting the film score. (*Id.* ¶ 2.) In other words, had the first sentence of paragraph two represented a total conveyance of economic rights, then Umiliani would have no remaining economic rights to give. Plaintiff argues that this sentence does not involve the transfer of economic rights at all; rather, Plaintiff

argues that it was merely "reassur[ing] Umiliani" that Plaintiff would respect Umiliani's moral rights by virtue of Umiliani's "complete transfer" effectuated earlier in the second paragraph. (Supp. Opp'n 12; *see also id.* at 17 (arguing that this clause is not a "*further* grant of rights to make certain derivative works," and instead simply clarifies the scope of the "all rights" language).)  But Plaintiff's argument is simply untenable in light of the plain language of the 1966 Agreement, under which Umiliani "*also* gives" Plaintiff the right to extract musical excerpts from the film score.  As this language makes clear, the second sentence of paragraph two was meant to entail a separate and distinct conveyance from the transfer enumerated in the first sentence of that paragraph.

Plaintiff's proposed construction is especially inappropriate in light of the fact that, as both experts acknowledge, Vocal and Instrumental are considered commissioned works.  (Doc. No. 51 ("July 12 Tr.") at 15:24–25; Sept. 13 Tr. 22:5–7.)  As noted above, Italian copyright law provides that Plaintiff's rights to use Vocal and Instrumental belong to Plaintiff only "within the limits of the object and purpose" of the contract.  As is clear from the language of the 1966 Agreement itself, its "object and purpose" was to facilitate the composition, performance, and dissemination of music for the 1966 Film.  (*See* 1966 Agmt. ¶¶ 1, 2, 5.)  Plaintiff asserts that as a music publisher, it was interested in the broadest possible conveyance of rights associated with the music commissioned for the film, including the right to exploit derivative versions of Vocal and Instrumental.  (Ghidini Decl. 11–12.)  But Plaintiff fails to explain why its acquisition of exclusive rights to all future derivations of Vocal and Instrumental would have been *necessary* to achieve the 1966 Agreement's purposes.  In fact, as one treatise explains, "[e]xclusivity is not considered essential in . . . publishing agreement[s]" in Italian law.  Mondini § 80:13.  In any event, the Court must consider the interests of *both* parties when construing the agreement, with

the default rules under the Italian Copyright Act favoring the transferor rather than the transferee. *See Pignoloni*, 2012 WL 5904440, at *24 (courts must consider "the common intent of the parties . . . in interpreting" contracts under Italian law (quoting *Italian Civil Code* § 1362)). Put simply, had the parties wished to transfer full ownership of the economic rights in the music, or at least exclusive ownership of the right to exploit derivative versions of it, they easily could have done so. As written, however, the 1966 Agreement reveals no such intent, much less an express stipulation transferring exploitation rights to derivative works not yet in existence.

Notwithstanding the language of the 1966 Agreement, Plaintiff's expert points to a series of Italian cases in which a composer was found to have transferred the totality of his economic rights, extrapolating from these decisions the proposition that, under "music publishing contracts," publishing companies *presumptively* assume "full and absolute ownership of the work." (*See* Sept 13 Tr. 14:11–17; *see also* 10:4–11, 11:11–17, 17:25–18:10, 26:20–27:3 (concluding that the default rule of construction with respect to music publishing agreements is conveyance of all economic rights "en bloc"). To be sure, a composer is free to assign the totality of his economic rights to a publisher under Article 107 of the Italian Copyright Act, or to any counterparty for that matter. But, as noted above, such transfers must be supported by the text of the relevant agreements. Thus, the Court finds Plaintiff's arguments for recognizing a *presumption* of total transfer in contracts involving music publishing companies to be unpersuasive for several reasons.

First, a presumption *in favor* of alienation in the context of music publishing agreements would represent a significant deviation from the principle that "narrow construction of copyright transfers . . . applies, as a matter of principle, to *any* contractual transfer of interests from the

author to another party."  Musso & Fabiani § 4[3][a][ii] (emphasis added).  Second, Plaintiff's

expert fails to cite a specific provision of the Italian Copyright Act carving out this special rule

for music publishing contracts and acknowledges that his argument is derived entirely from case

law in Italian courts (*see* Sept. 13 Tr. 15:4–10), notwithstanding the fact that Italy is "a civil law

jurisdiction" in which courts apply "civil code and statutory provisions as the primary source of

law and give them preponderant consideration," *see Curley v. AMR Corp.*, 153 F.3d 5, 14 (2d

Cir. 1998) (applying Mexican law).  In other words, in Italy there is a "lack of stare decisis and a

formal rule of precedent."  Douglas L. Parker, *Standing to Litigate "Abstract Social Interests" in*

*the United States and Italy: Reexamining "Injury in Fact,"* 33 Colum. J. Transnat'l L. 259, 275

(1995).  As a result, Plaintiff's expert's overreliance on court precedents and failure to ground

his arguments in the text of the Italian Copyright Act significantly undermines the

persuasiveness of his report and his testimony.  And while it is true that Italian court decisions,

particularly those of the Court of Cassation, may be treated as persuasive (even if not binding)

authority, *see Romantic Common Law, Enlightened Civil Law: Legal Uniformity and the*

*Homogenization of the European Union*, 7 Colum. J. Eur. L. 63, 88–89 (2001), a careful review

of the English translations of these cases (*see* Doc. No. 45) reveals no support for a presumption

in favor of alienation of all of a composer's economic rights in the context of music publishing

agreements.  In any event, even if a presumption in favor of "en bloc" alienation could be said to

exist with respect to music publishing agreements, the Court finds that the unambiguous

language reserving Umiliani's rights in the 1966 Agreement would rebut that presumption.

In light of the unambiguous language of the 1966 Agreement and the protections afforded

to authors under the Italian Copyright Act, the Court concludes that Plaintiff fails to plausibly

allege that it owns the exclusive right to exploit derivative works of Vocal and Instrumental,

such as *Mah Na Mah Na*. The Court thus finds that Plaintiff lacks standing to sue Defendants for copyright infringement, and that the First Amended Complaint must therefore be dismissed.[6]

IV. CONCLUSION

In sum, the Court concludes that the language of the 1966 Agreement forecloses any argument that Plaintiff owns exclusive rights to *Mah Na Mah Na*, and, therefore, Plaintiff lacks standing to sue. Accordingly, IT IS HEREBY ORDERED that Defendants' motion to dismiss is GRANTED. The Clerk is respectfully directed to close this case.

SO ORDERED.

Dated:      December 30, 2016
            New York, New York



RICHARD J. SULLIVAN
UNITED STATES DISTRICT JUDGE

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: ___12/30/16___

---

[6] The Court also finds that, even if the law of the United States were to apply, it would reach the same result. Under the 1909 Act, which would have applied at the time of the 1966 Agreement, "unless the author has given up his or her rights under copyright in a clear and unequivocal manner, he or she retains these rights." *Jim Henson Prods., Inc. v. John T. Brady & Assocs., Inc.*, 16 F. Supp. 2d 259, 285 (S.D.N.Y. 1997); *Philipp v. Jerome H. Remick & Co.*, 145 F. Supp. 756, 758 (S.D.N.Y. 1956) ("The clearest language is necessary to divest the author of the fruits of his labor."); *accord Warner Bros. Pictures v. Columbia Broad. Sys.*, 216 F.2d 945, 949 (9th Cir. 1954) (same); *see also Weinstein Co. v. Smokewood Entm't Grp., LLC*, 664 F. Supp. 2d 332, 341 (S.D.N.Y. 2009) (recognizing, under the 1976 Act, that "intention of a copyright owner seeking to transfer an ownership interest must be clear and unequivocal"). For the reasons set forth above, the Court concludes that Umiliani did not manifest a "clear and unequivocal" intent to convey his rights in Vocal and Instrumental in the 1966 Agreement.

Defendants also argue that Plaintiff's claim with respect to Instrumental should be dismissed because Umiliani did not convey the renewal term in the copyright to Plaintiff (Mem. 20–25) and that the 1966 Agreement has no application to Vocal because it was not ultimately included in the film (Mem. 17–19). Because the Court concludes that Plaintiff's suit should be dismissed for lack of standing, it declines to address these other arguments.